IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENNI KESSLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE ULTIMATE SOFTWARE GROUP, INC., SCOTT SCHERR, MARK D. SCHERR, JAMES A. FITZPATRICK, RICK A. WILBER, AL LEITER, JONATHAN MARINER, and JASON DORSEY,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

    Plaintiff Penni Kessler ("Plaintiff") by and through her undersigned attorneys, brings this class action on behalf of herself and all others similarly situated, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by The Ultimate Software Group, Inc. ("Ultimate Software" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Ultimate Software and the Defendants.

## SUMMARY OF THE ACTION

1. Plaintiff brings this class action on behalf of the public shareholders of Ultimate Software against the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of the Company to an investor group led by Hellman & Friedman Capital Partners ("Hellman," or "Parent") (the "Proposed Transaction").

2. On February 4, 2019, Ultimate Software entered into an Agreement and Plan of Merger (the "Merger Agreement") with Hellman. Pursuant to the Merger Agreement, Unite Merger Sub Corp. ("Merger Sub"), an indirect wholly owned subsidiary of Parent will merge with and into the Company, with Ultimate Software surviving as a privately held company (the "Merger").

3. Pursuant to the terms of the Merger Agreement, Hellman will acquire all outstanding common shares of Ultimate Software for $331.50 per share in an all-cash transaction valued at approximately $11 billion. The consummation of the Proposed Transaction is subject to certain closing conditions, including the approval of the stockholders of Ultimate Software.

4. On March 11, 2019, in order to convince Ultimate Software's stockholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading proxy statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Ultimate Software and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the

Proposed Transaction unless and until the material information discussed below is disclosed to Ultimate Software stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7. This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District. Additionally, the Company's common stock trades on the NASDAQ, which is headquartered in this District.

## THE PARTIES

9. Plaintiff is, and has been at all times relevant hereto, the owner of Ultimate Software common stock.

10. Defendant Ultimate Software is a Delaware corporation with its principal executive offices located at 2000 Ultimate Way, Weston, Florida 33326. The Company's common stock is traded on the NASDAQ under the symbol "ULTI."

3

11. Defendant Scott Scherr ("S. Scherr") is and has been the Company's Chief Executive Officer and Chairman of the Board at all times during the relevant time period.

12. Defendant Mark D. Scherr ("M. Scherr") is and has been a director of the Company at all times during the relevant time period.

13. Defendant James A. FitzPatrick, Jr. ("FitzPatrick") is and has been a director of the Company at all times during the relevant time period.

14. Defendant Rick A. Wilber ("Wilber") is and has been a director of the Company at all times during the relevant time period.

15. Defendant Al Leiter ("Leiter") is and has been a director of the Company at all times during the relevant time period.

16. Defendant Jonathan Mariner ("Mariner") is and has been a director of the Company at all times during the relevant time period.

17. Defendant Jason Dorsey ("Dorsey") is and has been a director of the Company at all times during the relevant time period.

18. Defendants S. Scherr, M. Scherr, FitzPatrick, Wilber, Leiter, Mariner, and Dorsey are collectively referred to herein as the "Individual Defendants."

19. The Individual Defendants, along with Defendant Ultimate Software, are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public shareholders of Ultimate Software (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

21. This action is properly maintainable as a class action for the following reasons:

a. The Class is so numerous that joinder of all members is impracticable. As of February 28, 2019, there were 31,680,177 Ultimate Software common shares outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b. Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) of the Exchange Act by misrepresenting or omitting material information concerning the Proposed Transaction in the Proxy Statement; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy Statement as currently composed.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

22. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

23. Ultimate Software is a leading provider of cloud-based human capital management solutions—often referred to as human capital management ("HCM")—and employee experience solutions. Ultimate Software's UltiPro product suite is a comprehensive, engaging solution that has human resources ("HR") and payroll at its core and includes benefits management, talent acquisition, talent management, time management, and global people management functionality available in 14 languages with 61 country-specific localizations. Ultimate Software also offers a-la-carte employee experience solutions, such as HR Service Delivery and "Perception," an employee-sentiment analysis solution.

24. Ultimate Software's solutions are delivered via software-as-a-service ("SaaS"), now more commonly known as cloud computing, to organizations with employees in the United States, Canada, Europe, Asia Pacific, and other global locations. At the close of 2018, the Company had more than 5,600 organizations as customers and more than 48 million people records in its cloud environment.

### The Company Announces the Proposed Transaction

25. On February 4, 2019, Ultimate Software and Hellman jointly issued a press release announcing the Proposed Transaction. The press release stated in part:

**Ultimate Software Announces Agreement to be Acquired by an Investor Group Led by Hellman & Friedman to Operate as a Privately Held Company**

6

*Ultimate Software Stockholders to Receive $331.50 Per Share in Cash; Ultimate to Continue Driving HCM Innovations Under Private Ownership*

Date: February 4, 2019 7:02 AM EDT

Ultimate Software (Nasdaq: ULTI), a leading global provider of human capital management (HCM) solutions in the cloud, today announced that it has entered into a definitive merger agreement to be acquired by an investor group led by Hellman & Friedman ("H&F"), a leading private equity investment firm, in an all-cash transaction for $331.50 per share in cash—representing an aggregate value of approximately $11 billion—after which Ultimate Software ("Ultimate") will operate as a privately held company.

Under the terms of the agreement, all Ultimate stockholders of record will receive $331.50 in cash for each share of Ultimate's common stock held upon the closing of the transaction. This price represents a premium of approximately 32% over Ultimate's volume-weighted average price during the 30 trading days ending February 1, 2019, and a premium to Ultimate's all-time high closing share price. Ultimate's Board of Directors has unanimously approved this transaction and recommended that stockholders vote in favor of the transaction.

Upon completion of the transaction, Ultimate will continue to operate under the leadership of CEO Scott Scherr and the existing senior management team. The privately held company will be owned by an investor group led by Hellman & Friedman in partnership with significant investors Blackstone, GIC, and Canada Pension Plan Investment Board (CPPIB), and other investors including JMI Equity.

"The transaction provides our stockholders with a substantial premium. Our decision was also made with the best interests of our 5,144 employees and our more than 5,600 customers at heart. This change will bring meaningful benefits to our employees and customers—both in the long and short terms. Since all of our employees are given equity in Ultimate when they join us, as stockholders, this transaction will result in immediate financial upside for them. Today's announcement will also allow us to make additional, prudent investments in our products and services to better serve our customers," said Scott Scherr, CEO, president, and founder of Ultimate.

"Our customers will benefit from our ability to bring new features and services to market more quickly, while still enjoying the same high level of service they have with Ultimate today, or better, with new innovations to our offerings. Hellman & Friedman is in full alignment with our vision to serve the global HR market, while preserving our unique company culture and mission," said Scherr.

For almost 29 years, Ultimate has focused exclusively on helping businesses improve the experience of their employees through leading HR and payroll solutions, and in recent years, through a comprehensive human capital

7

management suite. At the end of 2018, Ultimate's total revenues exceeded $1.1 billion and the company currently serves more than 5,600 companies worldwide, with more than 48 million people records in the cloud. After the transaction is complete, Ultimate will continue to develop, market, deliver, and service its suite of human capital management and employee experience solutions globally—including HR, payroll, benefits management, talent acquisition, talent management, workforce management, employee sentiment analysis, and HR service delivery—with no changes to the markets Ultimate serves and no changes to its mission: put "People First."

"Ultimate's market leadership in the human capital management segment, and the company's impressive track record of growth, are built on the outstanding quality of its software and its dynamic and motivated employees. The company deeply understands the essence of human capital management, having itself been recognized with numerous best workplace awards from leading publications for its exceptional mission-driven culture," said David Tunnell, partner at Hellman & Friedman. "We look forward to building on Ultimate's successes, working along with our investment partners: Blackstone, GIC, CPPIB, and JMI Equity."

Martin Brand, senior managing director at Blackstone, added, "We are excited to partner with Ultimate and this investor group to support the strong growth and culture of this exceptional company."

The transaction is expected to close in mid-2019, subject to stockholder approval and other customary closing conditions including regulatory approvals.

The definitive agreement for the transaction includes a 50-day "go-shop" period which permits Ultimate's Board of Directors and financial advisor to actively initiate, solicit, and encourage alternative acquisition proposals, and potentially enter negotiations with other parties that make alternative acquisition proposals. Ultimate will have the right to terminate the merger agreement to accept a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this 50-day "go-shop" will result in a superior proposal, and Ultimate does not intend to disclose developments with respect to the solicitation process unless and until the Board of Directors makes a determination requiring further disclosure.

Goldman Sachs & Co. LLC acted as exclusive financial advisor to Ultimate Software, and Stroock & Stroock & Lavan LLP provided legal counsel. Qatalyst Partners acted as financial advisor to the investor group and Simpson Thacher & Bartlett served as legal counsel to Hellman & Friedman.

26. The Proposed Transaction is subject to approval by the shareholders of Ultimate Software, as well as regulatory approvals.

8

**The Proposed Transaction is Unfair to Shareholders**

27.     The Proposed Transaction, as currently contemplated, is unfair to the Company's shareholders.

28.     First, the Merger Consideration offered in connection with the Proposed Transaction undervalues the Company. For instance, the Merger Consideration is $0.85 lower than the Company's recent 52-week high of $332.35 on September 14, 2018.

29.     In addition, on February 5, 2019, the Company announced its Full Year and Fourth Quarter 2018 financial results, reporting record 2018 recurring revenues of $997.1 million, up by 24%, record 2018 total revenues of $1.14 billion, up by 21%, record Fourth Quarter recurring revenues of $266.4 million, up by 24%, and record Fourth Quarter total revenues of $304.8, up by 21%.

30.     Accordingly, the Company has demonstrated that it is well positioned for financial growth and the Merger Consideration fails to take that into account.

31.     Next, the Company agreed to certain preclusive deal protection devices that ensure that no competing offer for the Company' would be forthcoming.

32.     Specifically, Defendants agreed to: (i) a provision requiring the Company to notify Hellman of any offer, indication of interest, or request for information made by an unsolicited bidder; (ii) a provision requiring the Company to grant Hellman 5 days to submit a topping offer to any superior proposal for acquisition of the Company; and (iii) a provision requiring the Company to pay a termination fee of $330 million if the Company ultimately decides to pursue another offer following the go-shop period.

33.     These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Board's ability to act with respect to investigating and

pursuing superior proposals and alternatives. Given that the preclusive deal protection provisions in the agreement between the companies impede a superior suitor from emerging, it is imperative that the Company's shareholders receive all material information necessary for them to make an informed decision as to whether to tender their shares in favor of the Proposed Transaction.

**Compensation to the Company's
Officers and Directors Resulting From the Proposed Transaction**

34. Certain of the officers and/or directors of the Company have significant financial interests in completing the Proposed Transaction.

35. The following table, extracted from the Proxy Statement, sets forth the stock units that have been awarded to the Company's executive officers and directors which will vest and be converted into the right to receive either the Merger Consideration or another amount following consummation of the Proposed Transaction:

| Named Executive Officer | Cash ($) | Equity($)[(1)] | Perquisites / Benefits($) | Total ($)[(1)] |
|---|---|---|---|---|
| Scott Scherr | — | 36,716,277.00 | — | 36,716,277.00 |
| Felicia Alvaro | — | 13,923,331.50 | — | 13,923,331.50 |
| Mitch Dauerman | — | 13,184,749.50 | — | 13,184,749.50 |
| Adam Rogers | — | 16,022,721.00 | — | 16,022,721.00 |
| Julie Dodd | — | 12,707,721.00 | — | 12,707,721.00 |
| Greg Swick | — | 9,668,860.50 | — | 9,668,860.50 |

36. Accordingly, certain of the Individual Defendants are motivated by their desire to secure personal benefits as a result of the Proposed Transaction. Certain directors and/or officers stand to reap significant financial benefits at the expense of the Company and its public shareholders if the Proposed Transaction is consummated, including the right to receive change-in-control benefits (such as the acceleration of their stock options), thus putting their own personal financial interests irreconcilably in conflict with the interests of the Company and its public shareholders.

## FALSE AND MISLEADING STATEMENTS
## AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

37. On March 11, 2019, the Company filed the Proxy Statement with the SEC. The Proxy Statement recommends that the Company's stockholders vote in favor of the Proposed Transaction. The Proxy Statement contains the financial opinion and analyses of the Company's financial advisor Goldman Sachs & Co. LLC ("Goldman Sachs") in connection with the Proposed Transaction.

38. Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### Misrepresentations or Omissions Regarding Management's Financial Projections

39. The Proxy Statement contains financial projections prepared by the Company's senior management given to the Board and Goldman Sachs in connection with the Proposed Transaction, but fails to provide material information concerning such.

40. First, the Proxy Statement provides several projections for non-GAAP metrics, including Gross Profit, Operating Income and Operating Margin, Unlevered Free Cash Flow, and Adjusted EBITDA. However, the Proxy Statement fails to disclose the necessary line item projections for the metrics used to calculate these non-GAAP measures.

41. The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such

11

projections.[1] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

42.     Accordingly, in order to make the projections noted above in the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

43.     Failure to provide complete and full disclosure of the line item projections for the metrics used to calculate the above-mentioned non-GAAP metrics leave the Company's shareholders without the necessary, material information to reach a fully-informed decision concerning the Company, fairness of the merger consideration, and whether to vote in favor of the Proposed Transaction.

### Material False and Misleading Statements or Material Misrepresentations or Omissions Regarding Goldman Sachs' Financial Opinion

44.     The Proxy Statement contains the financial analyses and opinion of Goldman Sachs in connection with the Proposed Transaction, but fails to provide material information concerning such.

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

45. With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analyses*, the Proxy Statement fails to disclose: (i) unlevered future free cash flows of the Company; (ii) the basis for selection of a range of discount rates from 8.00% to 9.00%; and (iii) the basis for perpetuity growth rates of 3.5% to 4.5% that were applied to arrive at the terminal values.

46. With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose: (i) forecasted net debt; (ii) projected year-end fully diluted outstanding shares of the Company's common stock; (iii) the basis for selection of a discount rate of 8.3%; and (iv) the basis for the next twelve months' revenue multiples of 5.75x to 6.75x.

47. With respect to Goldman Sachs' *Premia Analysis*, the Proxy Statement fails to disclose: (i) the transactions used in Goldman Sachs' analysis; and (ii) the premiums paid in each of the transactions observed by Goldman Sachs.

48. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

49. Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions. Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

# COUNT I

## (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

50.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

52.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

53.    Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

54.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue

of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

55. The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

56. The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57. The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

58. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

59. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

60. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61. The Individual Defendants acted as controlling persons of Ultimate Software within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ultimate Software, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62. Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, each of the Individual Defendants had direct and supervisory

16

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

64. In addition, as set forth in the Proxy Statement sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

67. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 26, 2019                               Respectfully submitted,

By: /s/ Joshua M. Lifshitz
Joshua M. Lifshitz
Email: jml@jlclasslaw.com
**LIFSHITZ & MILLER LLP**
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Penni Kessler, hereby certify that:

1. Plaintiff has reviewed the complaint and authorized the commencement of a lead plaintiff motion and/or filing of a complaint on plaintiff's behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in ULTI securities that are the subject of this litigation during the Class Period are attached hereto as Exhibit A.

5. I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Executed on 03/22/2019

*Penni Kessler*

    Signature

**Exhibit A**

My transactions in The Ultimate Software Group, Inc. (ULTI) securities that are the subject of this litigation during the class period set forth in the complaint are as follows ("P" indicates a purchase, "S" indicates a sale):

| Security | Date | Sale | Purchase | Number of Shares | Price per Share |
|---|---|---|---|---|---|
| ULTI | 05/04/2009 | | P | 60 | $19.7398 |
| ULTI | 10/31/2008 | | P | 100 | $13.0032 |
| ULTI | 01/09/2008 | | P | 50 | $28.6498 |